UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
EDUARDO MAZZARO DE ABREU, ET AL.,         :
                                          :
            Plaintiff,                    :
                                          :
            -against-                     :      06 Civ. 673 (LMM)
                                          :      MEMORANDUM AND ORDER
BANK OF AMERICA CORPORATION,              :
BANK OF AMERICA, N.A., AND                :
STANDARD CHARTERED BANK                   :
                                          :
            Defendants.                   :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/10/07
```

MCKENNA, D.J.

        Defendants Standard Chartered Bank ("Standard Chartered")

and Bank of America Corporation and Bank of America, N.A.[1]

(collectively "BOA") (all, collectively, "Defendants") move

pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of

Civil Procedure to dismiss the complaint filed by 94 individual

plaintiffs[2] ("Plaintiffs") involving an alleged international

---

[1] The First Amended Complaint does not distinguish between Bank of
America Corporation and Bank of America, N.A. in stating its
claims.  (First Amended Complaint ("FAC") ¶ 1.)

[2] Plaintiffs ("Plaintiffs") are Eduardo Mazzaro de Abreu;
Acapulco International Ltd.; Antonio Carlos Ahoun; Carla Aldred;
Eduardo Aragon; Paulo Roberto Baggio de Castro; Balaton Business
L.L.C.; Balroom Universal Inc.; Mercede Barbiani; José Luiz
Quadros Barros; Lionello Bassani; Giovane O. Bastos; Helvécio
Belisário; Loide Silva Beulke; Nelson Boni; Luis Felipe da Rocha
Brandão; Marcos Teixeira de Carvalho; Edson Castelan; Jose
Castelo; Pascoal D'Angelo and André D'Angelo; Antonio Carlos De
Castro; Won Chou; Filadelfio dos Reis Dias; José Alves Duraes;

money laundering scheme perpetrated by third parties who utilized bank accounts established at Standard Chartered and BOA.[3] For the reasons set forth below, Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

---

Amir Michel Farha; Marcos Braga Ferreira; Wilson José de Souza Filho; Maria Beatriz Mayer Funari; John Gardiner; Carlos Henrique Gentile; João Justo Giaquinto; Sergio A. Gusman; International Investments Overseas; Deny Jeneral; Maria Helena Joiozo; Peter Jordan; Dante Laurini Júnior; Kamir Investments S.A.; Jacira Klein; Loivo Valdir Krein; Alberto Kushima; Paulo de Carvalho Lacombe; William Lei; Pedro A. Livramento; Mario Manprin; Helvécio Neves Marins; Laurentino Mascari; Edgar Melo; Maria Luisa de Sá Marinda; Oraci Morelli; Eliane Alves Moura; Augusto Camargo Neto; Decio Aldred Neto; Paulo de Oliveira Neto; Paulo Nishimura; Omega Parts Trade Limited; Pacific Coast Independent Industrial Corp.; Fernando Arena Panizzutti; Peastrow S.A.; Dirceu Pereira; Ângelo Polizzi; Prime Trade Corp.; RALFFA LLP; Marcus Aurélio Pereira Rodrigues; Rutherford Trading S.A.; Rutherford Investment Group C.V.; Rutherford UK LLP; Victor Albert Samama; Cesar Geraldo Hupsel dos Santos; Artur Nogueira dos Santos; São Cristóvão Comercial Exportadora Ltda.; Junia Maria Rios Neto Sarti; Anna Schlossman; Seral Holdings Corp.; Marcos Sibinelli; Edilson Ferreira da Silva; David Skaf; Sandra De Fátima Ferreira Soares; Vánia Silva Souza; Jaime Storto; Strepton Services Ltd.; Sunbourn Sociedad Anonima; Darcy Teila; Sandra Alves Teixeira; Teltec International Investment S.A,; Sérgio Terra; Egashira Toshihiko; Udstar Corporation; Joao Urbano; Vismia Corporation; Miguel Vizioli; Maria Helena Cavalcanti Wanderey and Work Investments, Inc.

[3] 93 of the Plaintiffs are aliens.  (FAC ¶¶  40-67, 69-130.)  One is a U.S. Citizen.  (FAC ¶ 68.)  None is a resident of Delaware or North Carolina.  (FAC ¶ 131.)

I. **Background**

A. **Facts**[4]

Plaintiffs allege that Defendants "participated in and substantially assisted" a fraud and money laundering scheme perpetrated by Bank of Europe, an offshore bank licensed in Antigua and Barbuda, and its owner, Edemar Cid Ferreira ("Ferreira"), causing "Plaintiffs and others to lose approximately $250 million." (First Amended Complaint ("FAC") ¶¶ 1, 5.) Bank of Europe solicited funds from investors with promises of high rates of return over short investment periods.[5] (FAC ¶¶ 6, 163.) Furthermore, it "was Bank of Europe's policy to urge participants to leave their money" with Bank of Europe upon maturity of their investments, and not to withdraw their funds. (FAC ¶ 172.) "As the fraud became public and . . . began to fall apart, Bank of Europe began . . . refus[ing] participants' requests to have their matured funds returned to them." (FAC ¶ 172.) Plaintiffs never got their money back. (FAC ¶ 7; see also ¶¶ 150, 167.)

---

[4] All facts herein are taken from Plaintiff's First Amended Complaint and are assumed true for purposes of this motion to dismiss.

[5] Investment periods were usually six or twelve months. Precise terms of investment varied among the individual plaintiffs. (FAC ¶¶ 40 – 130, ¶167.)

Bank of Europe was a "shell bank" that required the services of a "correspondent bank" to perform basic banking operations and process transactions on its behalf. (FAC ¶¶ 5, 146.) Standard Chartered served as the correspondent bank for Bank of Europe from 1999 until late 2003. (FAC ¶ 5.) BOA served in the same capacity from November 2003 until the collapse of Bank of Europe in December 2004. (FAC ¶¶ 5, 133.) Both Defendants processed transactions through their New York locations. (FAC ¶¶ 5, 155.) Bank of Europe instructed Plaintiffs to wire their investment deposits to a single account belonging to Bank of Europe at the appropriate correspondent bank. (FAC ¶ 169.) Bank of Europe ostensibly was to take the funds, invest them in what it termed the "Loan Participation Program," and return them to the respective participant, along with promised interest at maturity. (FAC ¶¶ 6, 150.)

Instead, Plaintiffs allege, "Ferreira stole . . . Plaintiffs' money" with the Defendants' knowledge, and spent it. (FAC ¶¶ 7, 8, 159.) Defendants "improper[ly]" transferred funds in "hundreds of separate documented instances" to various "offshore" companies controlled by Ferreira and to "dozens of vendors [to] which Ferreira owed money." (FAC ¶¶ 9, 133, 159, 174.) With respect to BOA, such transfers allegedly violated its internal policy. (FAC ¶¶ 210, 211.)

4

Furthermore, Plaintiffs allege that Defendants transferred hundreds of millions of dollars from the Bank of Europe accounts to entities that Defendants allegedly knew were "Brazilian black market currency traders" from 2001 through 2004.  (FAC ¶ 36.) Standard Chartered and BOA both have their own proprietary electronic payment systems that required account holders such as Bank of Europe to provide the name of each recipient of electronic payments.  (FAC ¶ 24.)  Therefore, Plaintiffs allege, Defendants knew the identities of the recipient entities.[6]  (FAC ¶¶ 159, 180.)  Transfers of funds occurred "pursuant to instructions from Bank of Europe."  (FAC ¶ 23.)  Most transfers occurred within three days of receipt of funds by Defendants, and the Bank of Europe accounts "rarely had balances of more than $4 million."  (FAC ¶¶ 9, 158, 173, 178.)

Standard Chartered never inquired about the volume or type of activity in Bank of Europe's account.  (FAC ¶ 181.)  However, in the fall of 2002, Eduardo Viola[7] ("Viola") of Standard Chartered informed Bank of Europe that it was terminating its relationship as Bank of Europe's correspondent bank for three

---

[6] Recipients allegedly included American Express, members of Ferreira's family, entities in the construction industry, auction houses, and art, book, map, and photography dealers, in addition to allegedly illegitimate black market currency traders.  (FAC ¶¶ 10, 174, 211.)
[7] Plaintiffs do not provide information regarding Eduardo Viola's position or title at Standard Chartered, or the nature of his relationship with Bank of Europe.

reasons: (1) Standard Chartered had changed its policy and would terminate its service as a correspondent bank for banks licensed to conduct only offshore transactions; (2) Standard Chartered was "concerned about getting caught making fraudulent transfers to Ferreira and his offshore companies;" and (3) Standard Chartered did not want "to risk violating the Patriot Act by participating in money laundering." (FAC ¶ 182.) However, Standard Chartered continued its relationship with Bank of Europe for one year, ten months longer than the period dictated by its policy of allowing services for two months following notice, allegedly for the prospect of conducting future business with Ferreira.[8] (FAC ¶¶ 183, 186.) Standard Chartered generated "substantial fees" due to the "unusually large volume of transfers" from the Bank of Europe account. (FAC ¶ 186.)

After closing its account at Standard Chartered near the end of 2003, Bank of Europe began using BOA as its correspondent bank. (FAC ¶ 169.) Like Standard Chartered, BOA was collecting "substantial fees" as the correspondent bank for Bank of Europe. (FAC ¶ 193.) In addition, BOA allegedly had the same desire to establish a long-term relationship with Ferreira in order to

---

[8] Plaintiffs do not indicate where this policy is formally expressed.

generate potentially substantial business.[9]  (FAC ¶ 186.)  To
this end, Paolo Perreira ("Perreira"), a BOA employee assigned
to manage the relationship with Bank of Europe, allegedly
suggested to Bank of Europe that it "more effectively could
conceal the fraud by opening a separate bank account" in the
name of another company owned by Ferreira.  This would "mask the
frequency with which Bank of Europe transferred large sums of
its clients' money."  (FAC ¶ 192.)  Bank of Europe ultimately
declined to do so.  (Id.)  Furthermore, Perreira requested and
received from Bank of Europe addresses of some of the recipient
accounts.  (FAC ¶ 190.)   Perreira and Alphonso Guevara
("Guevara"), his coworker also assigned to the Bank of Europe
account, shared a joke with an unidentified representative of
Bank of Europe regarding the financial advantages of being
related to one of Bank of Europe's beneficiaries.  (FAC ¶190.)
According to Plaintiffs, BOA had knowledge that "from the
beginning of BOA's tenure" as Bank of Europe's correspondent
bank, "transfers from the Bank of Europe account were helping
Ferreira steal Plaintiff's money" through four named BOA
employees: Perreira; Guevara; the superior to whom they
reported, Stephen J. Todaro ("Todaro"); and the head of BOA's

---

[9]  This allegedly included the continued maintenance of the $180
million account then held in the name of Ferreira's wife.  (FAC
¶193.)

Sao Paolo office, Henrique B. Larroude ("Larroude"); as well as "additional" unidentified BOA employees. (FAC ¶¶ 188, 189.)

A few weeks after the Central Bank of Brazil, that country's monetary authority, took control over Banco Santos, another financial institution controlled by Ferreira, BOA informed Bank of Europe that it would be "closing its correspondent bank account on January 15, 2005." (FAC ¶ 194.) On February 8, 2005, the Antiguan High Court of Justice ordered Bank of Europe, in receivership since December 2004, placed into liquidation. (FAC ¶ 199.) In June 2005, the Federal Public Ministry of Brazil indicted Ferreira for "money laundering, conspiracy, tax evasion, and providing false audits" involving Banco Santos. (FAC ¶ 200.)

## B. **The Instant Litigation**

Plaintiffs, investors through Bank of Europe, seek damages from both Standard Chartered and BOA for their actions as Bank of Europe's correspondent banks. Count I alleges that Defendants aided and abetted fraud. (FAC ¶ 39.) Count II alleges that Defendants aided and abetted a breach of fiduciary duty. (Id.) Count III alleges that Defendants committed acts of commercial bad faith. (Id.) Count IV alleges that Defendants were unjustly enriched. (Id.) Defendants here move

to dismiss all four counts for failure to state a claim under which relief may be granted.

## II. Discussion

### A. Rule 12(b)(6) Standard

Standard Chartered and BOA move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all four counts contained in the First Amended Complaint. A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In evaluating a complaint, a court must read the complaint generously, accepting the truth of, and drawing all reasonable inferences from, well-pleaded factual allegations. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The complaint must provide "plausible grounds" for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.[10] Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955,

---

[10] The Supreme Court recently overturned the pleading standard set in Conley v. Gibson, which had provided that a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1968 (2007) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In Twombly, the Supreme Court provides that "Conley's 'no set of facts' language has been

1965 (2007).  The issue on a motion to dismiss is not whether a

plaintiff is likely ultimately to prevail, "but whether the

claimant is entitled to offer evidence to support the claims."

Weisman v. LeLandais, 532 F.2d 308, 311 (2d Cir. 1976) (per

curiam).


B. **Rule (9)(b) Standard**


    Standard Chartered and BOA move pursuant to Federal Rule of

Civil Procedure 9(b) to dismiss the first three of four counts

contained in the First Amended Complaint.  Rule 9(b) provides

that the circumstances of fraud must "be alleged with

---

questioned, criticized, and explained away long enough," has
"earned its retirement," and is now "best forgotten."  Twombly,
127 S.Ct. at 1966.  The Second Circuit has recognized in Iqbal
v. Hasty that Twombly "explicitly disavowed" the "no set of
facts" standard that previously had been applied at the pleading
stage, and "require[s] a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is needed
to render the claim plausible." Iqbal v. Hasty, ___ F.3d ___,
2007 WL 1717803 at *9, *11 (2d Cir. June 14, 2007).
Furthermore, while Twombly was an antitrust case, the Second
Circuit and the Southern District of New York have applied
Twombly more broadly, as in: (1) Iqbal, ___ F.3d ___, 2007 WL
1717803 (qualified immunity defense), (2) ATSI Communications,
Inc. v. Shaar Fund, Ltd., ___ F.3d ___, 2007 WL 1989336 at *15
n.2. (2d Cir. July 11, 2007) (declining, in the context of
securities fraud, "to read Twombly's flexible 'plausibility
standard' as relating only to antitrust cases"), and (3) most
similar to the present matter, American Fin. Int'l Group-Asia,
L.L.C. v. Bennett, Slip Copy, No. 05 Civ. 8988 (GEL), 2007 WL
1732427 (S.D.N.Y. June 14, 2007) (applying Twombly's
plausibility standard to claims of, inter alia, breach of
fiduciary duty and unjust enrichment).

particularity," requiring "reasonable detail as well as allegations of fact from which a strong inference of fraud reasonably may be drawn." National Council of Young Israel v. Wolf, 963 F.Supp. 276, 281 (S.D.N.Y. 1997) ("Young Israel"). The rule also provides that "condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). A more general standard of scienter is applicable because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." Wight v. Bank America Corp., 219 F.3d 79, 91 (2d Cir. 2000) (citing Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987)). However, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Shields v. CityTrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks and citations omitted). Therefore, with respect to "condition of mind," it is required that a plaintiff "allege facts that give rise to a strong inference of fraudulent intent." Id., see also Polycast Technology Corp. v. Uniroyal, Inc., 728 F. Supp. 926, 935 (S.D.N.Y. 1989) (citing Connecticut Nat'l, 808 F.2d at 962).

A complaint may give rise to a strong inference of fraudulent intent in two ways. First, the plaintiff may allege "a motive for committing fraud and a clear opportunity for doing so." Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir.

11

1995) (quoting Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987), overruled in part on other grounds, United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir. 1989) (en banc) (citations omitted)).  Second, where there is no apparent motive, it is also possible to plead scienter by "identifying circumstances indicating conscious behavior by the defendant," but "the strength of circumstantial allegations must be correspondingly greater." Powers, 57 F.3d at 184.

## C. Count I - Aiding and Abetting Fraud

To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) actual knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the underlying fraud.  See Oei v. Citibank, N.A., 957 F.Supp. 492, 520 (S.D.N.Y. 1997) (citing Morin v. Trupin, 711 F.Supp. 97, 112 (S.D.N.Y. 1989)). Constructive knowledge is insufficient to create aiding and abetting liability; actual knowledge is required.  See Steed Fin. L.D.C. v. Laser Advisers, Inc., 258 F.Supp.2d 272, 282 (S.D.N.Y. 2003).  "Substantial assistance" exists where a defendant "affirmatively assists, helps to conceal, or by virtue of failing to act when required to do so enables the fraud to

12

proceed." Pension Comm. of Univ. of Montreal Pension Plan v.
Banc of America Sec., L.L.C., 446 F.Supp.2d 163, 202 (2006)
(citing Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98
Civ. 4960 (MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999)). The
substantial assistance must be the proximate cause of the harm
on which the primary liability is predicated. Pension Comm.,
446 F.Supp.2d at 202 (citing JP Morgan Chase Bank v. Winnick,
406 F.Supp.2d 247, 256 (S.D.N.Y. 2005)). A party alleging aider
and abettor liability with respect to fraud must meet the
requirements of Federal Rule of Civil Procedure 9(b). See
Morin, 711 F.Supp. at 112-13.

**1. Existence of an Underlying Fraud**

The first element of aiding and a betting fraud is the
existence of an underlying fraud. See Oei, 957 F.Supp. at 520.
In the present case, Plaintiffs allege that Bank of Europe
solicited funds from Plaintiffs and others with the promise of
returning a profit which it did not intend to fulfill. (FAC ¶
163.) Bank of Europe ostensibly was to invest the funds in the
"Loan Participation Program." (FAC ¶¶ 6, 150.) Instead, under
Ferreira's control, Bank of Europe directed the funds towards
paying vendors and lenders to whom Ferreira owed money. (FAC ¶¶
7, 163.) The complaint alleges that "Bank of Europe never

13

returned the money that Plaintiffs invested in the Loan
Participation Program."  (FAC ¶ 163.)  This constitutes the
underlying fraud in the present matter, and it is alleged with
particularity.  As the underlying fraud was the same for both
Standard Chartered and BOA, the first element is satisfied with
respect to both defendants.

**2. Actual Knowledge**

a. Standard Chartered

     The second element of aiding and abetting fraud requires
actual knowledge by the aider and abettor of the fraudulent
scheme.  See Oei, 957 F.Supp. at 520.  With respect to Standard
Chartered, Plaintiffs allege that the nature of transfers out of
the Bank of Europe account and the general amount of funds
within the account are sufficient to allege actual knowledge of
the fraud.  Most transfers occurred within three days of receipt
of funds by Defendants, and the Bank of Europe accounts "rarely
had balances of more than $4 million."  (FAC ¶¶ 9, 158, 173,
178.)  However, these factual allegations at most would
indicate only constructive knowledge of a fraudulent scheme, and
are insufficient to support an allegation that Standard

14

Chartered had actual knowledge of an underlying fraud.  See Steed, 258 F.Supp.2d at 282.

Plaintiffs also allege that Standard Chartered had a motive in the "substantial fees" generated in exercising their "unusually large volume" of opportunities to facilitate fraudulent transfers at the behest of Bank of Europe.  (FAC ¶¶ 182, 186.)  Actual knowledge may be implied from a strong inference of fraudulent intent.  See Young Israel, 963 F.Supp. at 281.  However, a plaintiff "must allege more than [an] interest in bank fees . . . to create a reasonable inference of fraudulent intent."  Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2000 WL 781081 at *13 (S.D.N.Y. June 16, 2000) (citing Chill v. General Electric Co., 101 F.2d 263, 268 (2d Cir. 1996) ("such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter" (internal quotations omitted))).  Standard Chartered's alleged profit motive does not provide a strong inference of fraudulent intent, and thus does not imply actual knowledge of the underlying fraud.

Furthermore, Plaintiffs assert that since Standard Chartered had actual knowledge of the identities of the recipients of funds, it had actual knowledge of the fraud.  (FAC ¶ 159, 180.)  Standard Chartered maintains a proprietary payment

15

system that requires the name of each recipient of any electronic wire transfer. (FAC ¶ 24.) Having actual knowledge of identities of recipients for wire transfers does not necessarily imply having actual knowledge of any fraudulent activity. See Renner, 2000 WL 781081 at *6. However, Plaintiffs further allege that Standard Chartered transferred Bank of Europe funds to entities it knew were "black market currency traders." (FAC ¶ 36.) This is distinct from the allegations that Standard Chartered transferred fraudulently obtained funds to entities it had no reason to believe were illegitimate, and when construed in the Plaintiffs' favor this sufficiently alleges that Standard Chartered had actual knowledge of Bank of Europe's fraud. (FAC ¶ 23.)

Lastly, Plaintiffs allege that Eduardo Viola of Standard Chartered communicated to unidentified Bank of Europe "representatives" that Standard Chartered "was concerned with getting caught making fraudulent transfers to Ferreira and his offshore companies" from the Bank of Europe account, and that it did not want to "risk violating the Patriot Act by participating in money laundering."[11] (FAC ¶ 182.) Viola's communication of concern regarding Bank of Europe's fraud and money laundering would indicate actual knowledge of that fraud on the part of

---

[11] The First Amended Complaint does not specify whether the alleged money laundering had ever occurred.

16

Standard Chartered.  Thus, Plaintiffs' allegations that Standard Chartered knew some recipients of transfers to be "black market currency traders" and expressed its concern over fraud and money laundering are sufficient to satisfy the second element.

b. BOA

Plaintiffs provide similar allegations in support of their assertion that BOA had actual knowledge of the underlying fraud. First, Plaintiffs allege that the nature of transfers out of the Bank of Europe accounts and the general amount of funds within the accounts are sufficient to allege actual knowledge of the fraud on the part of BOA.  Most transfers occurred within three days of receipt of funds by Defendants, and the accounts "rarely had balances of more than $4 million."  (FAC ¶¶ 9, 158, 173, 178.)  Again, these factual allegations at most would indicate constructive knowledge of a fraudulent scheme, not actual knowledge.  See supra Section II.C.2.a.; see also Steed, 258 F.Supp.2d at 282.

Plaintiffs further allege that BOA, similar to Standard Chartered, had a motive in the "substantial fees" generated in exercising their "large volume" of opportunities to facilitate transfers that were part of a "fraudulent scheme at the behest of Bank of Europe.  (FAC ¶ 193.)  Per the analysis above, BOA's

17

alleged profit motive does not provide a strong inference of fraudulent intent, and does not imply BOA's actual knowledge of the underlying fraud.  See supra Section II.C.2.a.

Plaintiffs allege that Perreira and Alphonso Guevara, both BOA employees assigned to the Bank of Europe account, shared a joke with a representative of Bank of Europe pertaining to the financial advantages of being related to one of the Bank of Europe beneficiaries, and that this indicates knowledge of the fraud.  (FAC ¶ 190.)  Plaintiffs do not allege that the joke pertained to any fraud, but rather that it related to an entity, not alleged to be illegitimate, being paid by Bank of Europe. (Id.)  The joke, then, does not indicate any knowledge of fraud.

Plaintiffs also allege that Perreira and Guevara's superiors, Stephen J. Todaro and Henrique B. Larroude, "knew they were helping Ferreira steal Plaintiff's money."  (FAC ¶ 189.)  Plaintiffs do not flesh out this allegation with any other information; thus, the claim is conclusory, and as such, it is insufficient to indicate BOA's knowledge of Bank of Europe's fraudulent activities.

Plaintiffs furthermore assert that since BOA, like Standard Chartered, had actual knowledge of the identities of the recipients, it had actual knowledge of the fraud.  (FAC ¶ 159, 180.)  BOA, again like Standard Chartered, maintains a proprietary payment system that requires the name of each

recipient of any electronic wire transfer.  (FAC ¶ 24.)
Following the analysis above, that BOA knew the identities of
the recipients of funds does not imply that BOA had actual
knowledge of an underlying fraud.  See supra Section II.C.2.a.
Also similar to the allegations against Standard Chartered,
Plaintiffs further allege that BOA transferred Bank of Europe
funds to entities it knew were "black market currency traders."
Again, per the analysis above, this sufficiently alleges that
BOA had actual knowledge of the fraud.  Id.

Finally, Plaintiffs allege that Paolo Perreira of BOA
suggested to Bank of Europe that it "more effectively could
conceal the fraud by opening a separate bank account."  (FAC ¶
192.)  Like Plaintiffs' allegations that BOA knew some
recipients of transfers to be "black market currency traders,"
the fact that BOA advised Bank of Europe as to how to conceal
its fraudulent activities shows actual knowledge of fraud.
Therefore, the second element requiring actual knowledge of
fraud is met with respect to both Standard Chartered and BOA.

## 3. Substantial Assistance

a. Standard Chartered

The third element required for aiding and abetting fraud is substantial assistance to the achievement of the underlying fraud.  See Oei, 957 F.Supp. at 520.  First, Plaintiffs allege that Standard Chartered transferred funds at the direction of Bank of Europe to "obviously improper destinations for a host of obviously improper purposes" including American Express, members of Ferreira's family, entities in the construction industry, and art, book, map, and photography dealers.  (FAC ¶¶ 10, 23.)  However, the "mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance."  Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960 (MBM), 1999 WL 558141 at *8 (S.D.N.Y. July 30, 1999) (citing Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695 (LMM), 1997 WL 289865 at *5 (S.D.N.Y. May 30, 1997) (citations and internal quotations omitted)).  Furthermore, Plaintiffs' characterization of the transfers as "improper" is conclusory.  Therefore, that Standard Chartered allegedly executed such transactions does not constitute substantial assistance.

Plaintiffs also allege that Standard Chartered continued serving as Bank of Europe's correspondent bank for an additional year after it informed Bank of Europe that it would terminate its service as a correspondent bank for any bank licensed to conduct only offshore transactions.  (FAC ¶ 182-83.)  Standard

practice at Standard Chartered was to give offshore banks "just two months" to terminate such relationships.  (FAC ¶ 183.) However, violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance.  See Cromer Finance Ltd. v. Berger, 137 F.Supp.2d 452, 471 (S.D.N.Y. 2001) ("A failure to enforce margin requirements, or continuing to execute trades despite . . . violations" of "its own institutional rules" does "not constitute substantial assistance").

Furthermore, Plaintiffs allege that Standard Chartered "participated in and substantially assisted Bank of Europe's and Ferreria's fraud by repeatedly violating the anti-money laundering provisions of the Patriot Act" by failing to prevent itself "from being used to both defraud Plaintiffs and to launder money."  (FAC ¶ 201, 03-04.)  A violation of a federal regulation, such as the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), does not of itself constitute substantial assistance.  See Cromer Finance Ltd. v. Berger, 137 F.Supp.2d 452, 471 (S.D.N.Y. 2001) ("A failure to enforce margin requirements, or continuing to execute trades despite . . . violations" of "regulations of the [Federal Reserve Bank], [and] the N[ew ]Y[ork ]S[tock ]E[xchange]" does "not constitute substantial assistance").  Although the "fail[ure] to act when required to do so [and] enabl[ing] the fraud to proceed"

21

constitutes substantial assistance, inaction is substantial assistance only "when the defendant owes a fiduciary duty directly to the plaintiff." Id. at 470 (citing Kolbeck v. LIT America, Inc., 939 F.Supp. 230, 247 (S.D.N.Y., 1996)). Plaintiffs do not allege that Standard Chartered breached any fiduciary duty owed them.  Rather, Plaintiffs allege that Standard Chartered aided and abetted the breach of another's fiduciary duty.  (FAC ¶ 39.)  As such, that Standard Chartered allegedly violated the USA PATRIOT Act by failing to prevent itself from being used to defraud Plaintiffs and launder money does not constitute substantial assistance.

Lastly, Plaintiffs allege that Standard Chartered transferred Bank of Europe funds to entities Standard Chartered knew were "black market currency traders." (FAC ¶ 36.)  While Plaintiffs allege that Standard Chartered transferred funds at the direction of Bank of Europe, they fail to indicate how these transfers substantially assisted Bank of Europe in its fraud. Plaintiffs fail to provide "enough fact to raise a reasonable expectation that discovery will reveal [supporting] evidence" as required by Twombly's restricted pleading standard.  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).

Plaintiffs filed the First Amended Complaint prior to the decision in Twombly.  In light of that case, Plaintiffs are granted leave to amend their complaint under Rule 15(a) of the

Federal Rules of Civil Procedure with respect to the allegation
of transfers of funds from the Bank of Europe account to black
market currency traders contained in Paragraph 36 of the First
Amended Complaint.  (FAC ¶ 36; Plaintiffs' Response to Standard
Chartered's and BOA's Motions to Dismiss ("Pls' Opp'n") pg. 35.)
Plaintiffs fail here, though, to allege sufficiently that
Standard Chartered substantially assisted the achievement of the
fraud perpetrated by Bank of Europe.

b. BOA

With respect to BOA, Plaintiffs allege that that employee
Paolo Perreira of BOA suggested to Bank of Europe that it open a
separate bank account to "conceal the fraud" "more effectively."
(FAC ¶ 192.)  Bank of Europe rejected the suggestion.  (Id.)
Ignored advice is not substantial assistance in the achievement
of an underlying fraud.

Plaintiffs allege that BOA violated its internal policy by
transferring funds to "Ferreira's personal offshore bank
accounts and companies controlled by Ferreira," and to pay
"Ferreira's personal bills from art galleries, American Express
bills, and bills from auction houses and other vendors."  (FAC
¶¶ 211.)  Plaintiffs cite an alleged posting on BOA's website
entitled "Anti-Money Laundering and Anti-Terrorist Financing

Policy Statement" providing that BOA shall take measures such as
"severing relations with the customer, closing or freezing
accounts, and when appropriate filing a suspicious activity
report" when it has "indications that a customer's money
originated from criminal or other money laundering activities."
(FAC ¶ 210.)  While Plaintiffs sufficiently allege an underlying
fraud, which was the source of Bank of Europe's money,
Plaintiffs fail to allege here what "indications" BOA had, or
how these transfers violate this policy.  Furthermore, as noted
above, a violation of an organization's internal policy in this
context does not constitute, in and of itself, substantial
assistance.

Plaintiffs also allege that BOA, similar to Standard
Chartered, "participated in and substantially assisted Bank of
Europe's and Ferreira's fraud by repeatedly violating the anti-
money laundering provisions of the Patriot Act" by failing to
prevent itself "from being used to both defraud Plaintiffs and
to launder money."  (FAC ¶ 201, 203-04.)  However, again,
neither a violation of a federal regulation in and of itself,
nor failure to act, constitutes substantial assistance.  See
supra Section II.C.3.a.

Finally, Plaintiffs assert that BOA transferred Bank of
Europe funds to "black market currency traders."  (FAC ¶ 36.)
This is identical to their allegation against Standard

24

Chartered, and via the same reasoning, it fails to allege sufficiently that BOA substantially assisted any underlying fraud on the part of Bank of Europe. See supra Section II.C.3.a. The Court's grant of leave to amend with respect to their allegation against Standard Chartered applies also to their similar allegation against BOA. (FAC ¶ 36; Pls' Opp'n, pg. 35.) For the purposes of this motion, when all factual allegations are taken to be true, Plaintiffs fail to allege sufficiently that BOA substantially assisted the achievement of the fraud perpetrated by Bank of Europe. See supra Section II.C.3.a.

Defendants' Rule 12(b)(6) motions to dismiss for failure to state a claim with respect to Count I are GRANTED, but Plaintiffs are granted leave to amend to plead additional facts with respect to the alleged "black market currency traders." (FAC ¶ 36.)

### D. Count II – Aiding and Abetting Breach of Fiduciary Duty

To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach by a fiduciary of obligations to another; (2) actual knowing participation by the defendant in the fiduciary's breach of obligations; and (3) damages to the plaintiff. See Kolbeck,

939 F.Supp. at 245 (citing S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-848 (2d Cir.1987). A fiduciary duty may arise where "the parties to a contract specifically agree to such a relationship, or if one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., L.L.C., 446 F.Supp.2d 163, 195 (2006) (quoting Ross v. FSG PrivatAir, Inc., No 03 Civ. 7292 (NRB), 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004) (internal quotations omitted)). The plaintiff "must demonstrate that the [alleged party] was under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Pension Comm., 446 F.Supp.2d at 195-96 (quoting Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (internal quotations omitted)).

New York courts require actual knowledge of the primary wrong by the alleged aider and abettor.[12]  See Kolbeck, 939

---

[12] The Court notes that it cannot agree with the opinion in Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., L.L.C., that "[k]nowledge of the primary violation with respect to [either aiding and abetting fraud or aiding and abetting fiduciary duty] will entail knowledge of the primary violation with respect to the other." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., L.L.C., 479 F.Supp.2d 349, 372 (S.D.N.Y. 2007). A party may knowingly aid and abet a second party in a fraud without knowing that the same efforts were also aiding and abetting the second party in the breach of a fiduciary duty to a third party. Nor

F.Supp. at 246 (citing H20 Swimwear, Ltd. v. Lomas, 164 A.D.2d

804, 807, 560 N.Y.S.2d 19, 21-22 (1st Dep't 1990), and Abbott v.

Herzfeld & Rubin, P.C., 2002 A.D.2d 351, 351-52, 609 N.Y.S.2d

230, 231 (1st Dep't 1990)).  A plaintiff must allege that "the

defendant had actual knowledge of the primary violator's status

as a fiduciary and actual knowledge that the primary violator's

conduct contravened a fiduciary duty." Goldin Assocs., L.L.C.

v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688

(WHP), 2003 WL 22218643 at *8 (S.D.N.Y. Sep. 25, 2003) (citing

A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No 97 Civ. 4978

(LLM), 2002 WL 88226 at *12 (S.D.N.Y. Jan. 23, 2002) and Kaufman

v. Cohen, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169-70 (1st

Dep't 2003)). An entity "knowingly participates in a breach of

---

can the Court agree that "when a plaintiff adequately pleads
substantial assistance in connection with a fraud claim, he or
she fulfills also the participation element of the breach of
fiduciary duty claim." Fraternity Fund, 479 F.Supp.2d at 372
(citing Pension Comm., 446 F.Supp.2d 163).  Fraternity Fund
continues that aiding and abetting a breach of fiduciary duty
requires "that the defendant knowingly induced or [knowingly]
participated in the breach." Fraternity Fund, 479 F.Supp.2d at
360 (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294
(quoting Kaufman, 307 A.D. 113, and citing Wechsler v. Bowman,
285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941))).  Whereas the
standard for aiding and abetting fraud recognizes the required
elements of actual knowledge and substantial assistance as
distinct elements, the standard for aiding and abetting breach
of fiduciary duty conflates the two in its requirement of actual
knowing participation.  Therefore a pleading of substantial
assistance alone with respect to aiding and abetting fraud, and
without any allegation of scienter, is insufficient to fulfill
the element of actual knowing participation for aiding and
abetting breach of fiduciary duty. Kolbeck v. LIT America,
Inc., 939 F.Supp. 230, 245 (S.D.N.Y. 1996).

fiduciary duty only when it provides substantial assistance to the primary violator." Kaufman v. Cohen, 307 A.D. 113, 760 N.Y.S. 157 (1st Dep't 2003) (internal quotations and citations omitted). "[A]llegations of aiding and abetting liability must meet the particular requirements of Fed.R.Civ.P 9(b)" with respect to primary violations based on fraud. Kolbeck, 939 F.Supp. at 245; see also supra Section II.C.

## 1. Breach by a Fiduciary of Obligations to Another

The first element of aiding and abetting breach of fiduciary duty is the breach by a fiduciary of obligations to another party. See Kolbeck, 939 F.Supp. at 245. Plaintiffs invested the money in Bank of Europe with the written promise of a profitable return. (FAC ¶¶ 6, 40-130, 150.) This created a duty for Bank of Europe to act for the benefit of the Plaintiffs within the scope of the promises. See Pension Comm., 446 F.Supp.2d at 195-96 (defendant which held itself out to investors as having policies and procedures of fairness on which plaintiffs relied upon was found to have a fiduciary duty).

Furthermore, through Bank of Europe, "Ferreira stole . . . Plaintiffs' money" and spent it. (FAC ¶¶ 7, 8, 159.) This was a breach of Bank of Europe's fiduciary obligations to each plaintiff. Taken as true, these breaches of fiduciary duties

28

owed to Plaintiffs by Bank of Europe satisfy the first element, for both Standard Chartered and BOA.

## 2. Actual Knowing Participation

The second element is actual knowing participation by the defendant in the breach.  See Kolbeck, 939 F.Supp. at 245. Plaintiffs allege that Standard Chartered and BOA had actual knowledge of the fraud perpetrated by Bank of Europe.  See supra Section II.C.2.  However, Plaintiffs' allegations are insufficient to establish that either Standard Chartered or BOA knew that Bank of Europe had a fiduciary relationship with Plaintiffs.  See Goldin, 2003 WL 22218643 at *9 (plaintiff must allege that the defendant had actual knowledge of both the primary violator's fiduciary status and that the primary violator acted in contravention of that duty).  At the direction of Bank of Europe, Plaintiffs deposited funds in the singular "Bank of Europe" bank account at Standard Chartered and later at BOA.  (FAC ¶¶ 138-39, 173.)  While Plaintiffs take great care in the First Amended Complaint to allege that Defendants knew the identities of the recipients of the funds in the Bank of Europe accounts, they never allege that Defendants knew anything at all about Plaintiffs, or about the relationship between Plaintiffs and Bank of Europe.  (FAC ¶¶ 159, 180.)  Plaintiffs, then, do

not sufficiently allege Defendants' actual knowledge that Bank
of Europe had a fiduciary duty with respect to Plaintiffs.
Thus, the second element is not met with respect to either
Standard Chartered or BOA, and Plaintiffs fail to sufficiently
state a claim for aiding and abetting a breach of fiduciary duty
against either of the Defendants.

## 3. Damages to the Plaintiff

The third element of aiding and abetting breach of a
fiduciary duty is damages to the plaintiff.  See Kolbeck, 939
F.Supp. at 245.  Plaintiffs allegedly invested their money with
Bank of America with the expectation of its return with interest
in a short period, but "never got their money back."  (FAC ¶¶ 7,
150, 167.)  As these damages were the same with respect to
Standard Chartered and BOA, the third element is satisfied with
respect to both.

However, as the second element requiring actual knowledge
of the breach of fiduciary duty is not met with respect to
either Standard Chartered or BOA, Plaintiffs do not allege
sufficiently that Defendants aided and abetted breach of
fiduciary duty.  Defendants' Rule 12(b)(6) motions to dismiss
for failure to state a claim with respect to Count II are
GRANTED.

### E. Count III - Commercial Bad Faith

To state a claim for commercial bad faith against a bank, a plaintiff must allege: (1) a scheme or acts of wrongdoing; together with either: (2) allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith; or (3) allegations of complicity by bank principals in alleged confederation with the wrongdoers. See Peck v. Chase Manhattan Bank, N.A., 190 A.D. 2d 547, 548-49, 593 N.Y.S. 2d 509, 510-11 (1st Dep't 1993) (citing Prudential-Bache Sec., Inc. v. Citibank., N.A., 73 N.Y. 2d 263, 275-77 (1989)). Complicity is engaging in wrongdoing in confederation with others. See Williams v. Bank Leumi Trust, Co., No. 96 Civ. 6693 (LMM), 1998 WL 397887 at *10 (S.D.N.Y. July 15, 1998) ("Bank Leumi II"). "Bank principals" include "account officers responsible for" the pertinent account. Wight v. Bank America Corp., 219 F.3d 79, 82 (2d Cir. 2000). A correspondent bank becomes a participant to a fraudulent scheme when it "acts dishonestly - [when] it has actual knowledge of facts and circumstances that amount to bad faith." Prudential-Bache, 73 N.Y. 2d at 275.

A commercial bad faith claim is subject to the Rule 9(b) requirement "that the circumstances of the alleged fraud be alleged with particularity." Bank Leumi II, 1998 WL 397887 at *9. The circumstances must also be alleged with "reasonable

31

detail as well as allegations of fact from which a strong

inference of fraudulent intent" may be drawn.  Nigerian Nat'l,

1999 WL 558141 at *7 (quoting Shields v. CityTrust Bancorp,

Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) and citing Powers v.

British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir. 1995)).

## 1. Scheme or Acts of Wrongdoing

The first element of commercial bad faith is a scheme or

acts of wrongdoing.  See Peck, 190 A.D. 2d at 548, 593 N.Y.S. 2d

at 510-11.  Plaintiffs allege that Bank of Europe solicited

funds from Plaintiffs and others with a promise of returning a

profit that it did not intend to fulfill.  (FAC ¶¶ 6, 163.)

Bank of Europe ostensibly was to invest the funds in the "Loan

Participation Program."  (FAC ¶¶ 6, 150.)  Instead, under

Ferreira's control, Bank of Europe directed the funds towards

paying vendors and lenders to whom Ferreira owed money.  (FAC ¶¶

6, 7, 163.)  This constitutes a scheme of wrongdoing and is

alleged with particularity.  As this scheme and acts were the

same for both Standard Chartered and BOA, the first element is

satisfied with respect to both Defendants.

## 2.  Actual Knowledge of the Scheme or Wrongdoing

In a commercial bad faith claim, fulfillment of either the second or the third element is required. The second element of commercial bad faith requires actual knowledge of the scheme or wrongdoing that amounts to bad faith. See Peck, 190 A.D. 2d at 548-49, 593 N.Y.S. 2d at 510-11. Plaintiffs allege that Eduardo Viola of Standard Chartered communicated to unidentified Bank of Europe "representatives" that Standard Chartered "was concerned with getting caught making fraudulent transfers to Ferreira and his offshore companies" from the Bank of Europe account, and that it did not want to "risk violating the Patriot Act by participating in money laundering."[13] (FAC ¶ 182.) Viola's communication of concern regarding Bank of Europe's fraud and money laundering creates a strong inference of fraudulent intent and is sufficient to allege Standard Chartered's actual knowledge of the wrongdoing, amounting to bad faith. See supra Section II.C.2.a.

With respect to BOA, Plaintiffs allege that Paolo Perreira of BOA suggested to Bank of Europe that it "more effectively could conceal the fraud by opening a separate bank account." (FAC ¶ 192.) Perreira's communication of concern regarding Bank of Europe's fraud sufficiently alleges actual knowledge of that fraud on the part of BOA. See supra Section II.C.2.b. As the

---

[13] The First Amended Complaint does not specify whether the alleged money laundering had ever occurred.

first and either the second or the third elements is required to
establish commercial bad faith, Plaintiffs sufficiently state a
claim against both defendants by satisfying the first and second
elements alone.   Analysis of the third element follows.

**3. Complicity by Bank Principals**

a. Standard Chartered

The third element of commercial bad faith is complicity by
bank principals.  See Peck, 190 A.D. 2d at 549, 593 N.Y.S. 2d at
510-11.  Again, a claim for commercial bad faith requires
satisfaction of either the second or the third elements.
Plaintiffs allege that Eduardo Viola of Standard Chartered
communicated to unidentified Bank of Europe "representatives"
that Standard Chartered "was concerned with getting caught
making fraudulent transfers to Ferreira and his offshore
companies" from the Bank of Europe account, and that it did not
want to "risk violating the Patriot Act by participating in
money laundering."  (FAC ¶ 182.)  Viola's communication of
concern regarding his role in Bank of Europe's fraud and money
laundering sufficiently alleges wrongdoing in confederation with
Bank of Europe, and thus complicity.  See Bank Leumi II, 1998 WL
397887 at *10.

34

Plaintiffs do not provide information regarding Eduardo Viola's position or title at Standard Chartered or the nature of his relationship with Bank of Europe.  However, showing that Viola communicated to Bank of Europe his concerns regarding their actions, and communicated the prospective termination of Standard Chartered's relationship as correspondent bank to Bank of Europe, suffices to allege that he was an "account officer[] responsible for" the pertinent account, making him a "bank principal" in this regard.  Wight, 219 F.3d at 82.  (FAC ¶ 182.) Plaintiffs sufficiently allege, then, that Eduardo Viola was a bank principal acting in complicity with Bank of Europe, and the third element, requiring complicity by bank principals, is met with respect to Standard Chartered.

b. BOA

As to BOA, Plaintiffs allege that Perreira and Alphonso Guevara, both BOA employees assigned to the Bank of Europe account, shared a joke with a representative of Bank of Europe pertaining to the financial advantages of being related to one of the Bank of Europe beneficiaries, and that this indicates knowledge of the fraud.  (FAC ¶ 190.)  However, the joke does not indicate confederation in any wrongdoing by any employee or officer at of BOA.

35

Plaintiffs, then, allege that the superiors of Perreira and Guevara, Stephen J. Todaro and Henrique B. Larroude, "knew they were helping Ferreira steal Plaintiff's money." (FAC ¶¶ 188-89.) Plaintiffs do not flesh out this "knowledge" with any information regarding its expression, and thus the claim is conclusory.

Lastly, Plaintiffs allege that Paolo Perreira of BOA suggested to Bank of Europe that it "more effectively could conceal the fraud by opening a separate bank account." (FAC ¶ 192.) Perreira's communication of concern regarding Bank of Europe's fraud indicates confederation in wrongdoing by a bank principal at BOA and sufficiently alleges that BOA was complicit. See supra Section II.C.2.a.

Accordingly, the third element requiring complicity is met with respect to both Standard Chartered and BOA. Defendants' Rule 12(b)(6) motions to dismiss for failure to state a claim with respect to Count III are DENIED.

## F. Count IV – Unjust Enrichment

To state a claim for unjust enrichment under New York law, a plaintiff must allege that: (1) the defendant benefited; (2) the benefit was at the expense of the plaintiff; and (3) that equity and good conscience require restitution. See Beth Israel

Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006) (citing Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)). Unjust enrichment under New York law is "an amorphous cause of action" which "falls under the umbrella of quasi-contract, or contract implied in law." Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt. Inc., 14 F.Supp. 2d 331, 338 (S.D.N.Y. 1998) ("Pommier"). Under this quasi-contractual doctrine, "courts may infer the existence of an implied contract to prevent [the entity which] has obtained a benefit from another from unjustly enriching [itself] at the other party's expense." Id. at 388.

> [T]o recover under a theory of quasi-contract, a plaintiff must demonstrate that the services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.

Id. (citing Kagan v. K-Tel Entertainment, Inc., 172 A.D. 2d 375, 568 N.Y.S. 2d 756, 757 (1st Dep't 1991)).


## 1. Defendant Benefited

The first element for unjust enrichment requires the defendant to have benefited. See Beth Israel, 448 F.3d at 586. Standard Chartered generated "substantial fees" due to the

37

"unusually large volume of transfers" from its Bank of Europe
account.  (FAC ¶ 186.)  BOA similarly generated "substantial
fees" due to a "large volume" of transfers from its respective
Bank of Europe account.  (FAC ¶ 193.)  Thus, the first element
of unjust enrichment is met with respect to both.

**2. Defendant Benefited at the Expense of the Plaintiff**

The second element requires that the defendant benefited at
the expense of the plaintiff.  See Beth Israel, 448 F.3d at 586.
As discussed above, Standard Chartered and BOA both benefited by
their relationship with Bank of Europe.  See supra Section
II.F.1.  (FAC ¶ 186, 193.)  They generated fees for transferring
money at the direction of Bank of Europe.  (FAC ¶ 23.)  As the
transfers were done at the behest of Bank of Europe, Plaintiffs
must look to Bank of Europe for recovery, not to Defendants, and
second element of unjust enrichment is not met with respect to
either Standard Chartered or BOA.  See Pommier, 14 F.Supp. at
338.

**3. Equity and Good Conscience Require Restitution**

The third element for unjust enrichment stipulates that
restitution be granted when required by equity and good

38

conscience.  See Beth Israel, 448 F.3d at 586.  As Defendants
did not benefit at the expense of Plaintiffs, equity and good
conscience cannot require restitution.  See supra Section
II.F.2.  As Plaintiffs fail to establish both the second and
third elements required for unjust enrichment, Plaintiffs fail
to state a claim for unjust enrichment with respect to both
Standard Chartered and BOA. Defendants' Rule 12(b)(6) motions to
dismiss for failure to state a claim with respect to Count IV
are GRANTED.

## III. Conclusion

For the aforementioned reasons, Defendants' motions to dismiss Counts I, II and IV are GRANTED.  Defendants' motions to dismiss Count III are DENIED.  Pertinent to Count I, Plaintiffs' motion for leave to file a further amended complaint is GRANTED with respect to allegations of transfers of funds from the Bank of Europe accounts at both Standard Chartered and BOA to black market currency traders, contained in Paragraph 36 of the First Amended Complaint.  (FAC ¶ 36; Pls' Opp'n pg. 35.)


SO ORDERED.

Dated: September 7, 2007


_____
Lawrence M. McKenna
U.S.D.J.