```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
EDUARDO MAZZARO DE ABREU, ET AL.,   :
                                    :
                Plaintiffs,         :
                                    :
       -against-                    :   06 Civ. 673 (LLM)
                                    :   MEMORANDUM AND ORDER
BANK OF AMERICA CORPORATION,        :
BANK OF AMERICA, N.A., AND          :
STANDARD CHARTERED BANK             :
                                    :
                Defendants.         :
                                    :
------------------------------------x
```

MCKENNA, D.J.

Defendants Standard Chartered Bank ("Standard Chartered") and Bank of America Corporation and Bank of America, N.A.[1] ("collectively "BOA") (all, collectively, "Defendants") move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss the complaint filed by 94 individual plaintiffs[2] ("Plaintiffs") involving an alleged international

---

[1] The Second Amended Complaint does not distinguish between Bank of America Corporation and Bank of America, N.A. in stating its claims. (Second Amended Complaint ("SAC") ¶ 1.)

[2] Plaintiffs ("Plaintiffs") are Eduardo Mazzaro de Abreu; Acapulco International Ltd.; Antonio Carlos Ahoun; Carla Aldred; Eduardo Aragon; Paulo Roberto Baggio de Castro; Balaton Business L.L.C.; Balroom Universal Inc..; Mercede Barbiani; José Luiz Quadros Barros; Lionello Bassani; Giovane O. Bastos; Helvécio Belisário; Loide Silva Beulke; Nelson Boni; Luis Felipe da Rocha Brandão; Marcos Teixeira de Carvalho; Edson Castelan; Jose Castelo; Pascoal D'Angelo and André D'Angelo; Antonio Carlos De Castro; Won Chou; Filadelfio dos Reis Dias; José Alves Duraes; Amir Michel Farha; Marcos Braga Ferreira; Wilson José de Souza

money laundering scheme perpetrated by third parties who utilized bank accounts established at Standard Chartered and BOA.[3]  For the reasons set forth below, Defendants' motions to dismiss are DENIED.

I.  Background

   A. **Procedural Background**

---

Filho; Maria Beatriz Mayer Funari; John Gardiner; Carlos Henrique Gentile; João Justo Giaquinto; Sergio A. Gusman; International Investments Overseas; Deny Jeneral; Maria Helena Joiozo; Peter Jordan; Dante Laurini Júnior; Kamir Investments S.A.; Jacira Klein; Loivo Valdir Krein; Alberto Kushima; Paulo de Carvalho Lacombe; William Lei; Pedro A. Livramento; Mario Manprin; Helvécio Neves Marins; Laurentino Mascari; Edgar Melo; Maria Luisa de Sá Marinda; Oraci Morelli; Eliane Alves Moura; Augusto Camargo Neto; Decio Aldred Neto; Paulo de Oliveira Neto; Paulo Nishimura; Omega Parts Trade Limited; Pacific Coast Independent Industrial Corp.; Fernando Arena Panizzutti; Peastro S.A.; Dirceu Pereira; Ângelo Polizzi; Prime Trade Corp.; RALFFA LLP; Marcus Aurélio Pereira Rodrigues; Rutherford Trading S.A.; Rutherford Investment Group C.V.; Rutherford UK LLP; Victor Albert Samama; Cesar Geraldo Hupsel dos Santos; Artur Nogueira dos Santos; São Cristóvão Comercial Exportadora Ltda.; Junia Maria Rios Neto Sarti; Anna Schlossman; Seral Holdings Corp.; Marcos Sibinelli; Edilson Ferreira da Silva; David Skaf; Sandra De Fátima Ferreira Soares; Vánia Silva Souza; Jami Storto; Strepton Services Ltd.; Sunbourn Sociedad Anonima; Darcy Teila; Sandra Alves Teixeira; Teltec International Investments S.A.; Sérgio Terra; Egashira Toshihiko; Udstar Corporation; Joao Urbano; Vismia Corporation; Miguel Vizioli; Maria Helena Cavalcanti Wanderey and Work Investents, Inc.

[3] 93 of the Plaintiffs are aliens.  (SAC ¶¶ 71-91, 93-154.). One is a U.S. Citizen. (SAC ¶ 92.)  None is a resident of Delaware or North Carolina. (SAC ¶ 155.)

2

In their First Amended Complaint, Plaintiffs alleged four claims against Defendants: 1)aiding and abetting fraud, 2)aiding and abetting breach of fiduciary duty, 3)commercial bad faith, and 4)unjust enrichment. Defendants moved to dismiss all four counts of their complaint. <u>Mazzaro De Abreu v. Bank of America Corp.</u>, 525 F.Supp.2d 381 (S.D.N.Y. 2007)(hereinafter "Abreu I"). Defendants motion to dismiss Count III was denied. Defendants' motion to dismiss Counts I, II and IV were granted with Plaintiffs having leave to amend Count I with regard to the substantial assistance element of aiding and abetting fraud.

**B. <u>Facts</u>[4]**

Familiarity with the facts set forth in <u>Abreu I</u> is assumed for the purposes of this decision. 525 F.Supp.2d 381. In Plaintiffs' Second Amended Complaint, several additional facts were alleged and are summarized herein.

Plaintiffs allege that Defendants substantially assisted in a fraudulent money-laundering scheme perpetrated by Bank of Europe, i.e., a shell bank with no capacity to perform basic transactions without the assistance of a correspondent bank. (SAC ¶¶ 5, 169.) Standard Chartered served as correspondent bank for

---

[4]All facts herein are taken from Plaintiff's Second Amended Complaint and are assumed true for purposes of this motion to dismiss.

3

Bank of Europe from July 1999 to late 2003. BOA served as correspondent bank for Bank of Europe from November 2003 to late 2004. The alleged scheme involved Plaintiffs investing in Bank of Europe's Loan Participation Program with the promises that their money would be "'loaned,' or made available to, the financially stable Banco Santos as part of a credit facility" and returned to them with interest upon a certain maturity date. (SAC ¶ 6.) The Plaintiffs' money was pooled into a single account at Standard Chartered and then BOA. Plaintiffs never got their money back. (SAC ¶ 7.) In 2006, Bank of Europe's owner, Edemar Cid Ferreira ("Ferreira"), was "convicted in Brazil for bank fraud, money laundering, criminal association, and conspiracy." (SAC ¶ 2.)

Plaintiffs allege that Ferreira used the funds from the Loan Participation Program for his own expenses rather than investing it in Banco Santos or any other "legitimate business purpose." (SAC ¶ 7; see also, SAC ¶¶ 8-14.) Plaintiffs additionally allege that Ferreira used the funds to transfer "hundreds of millions of dollars more to offshore companies controlled by Ferreira." (SAC ¶ 15.) All of these transfers, Plaintiffs allege, were performed by Standard Chartered and BOA with knowledge that they were "improper" and "illegitimate." (SAC ¶¶ 7-15.)

In 2001, Standard Chartered asked Amadeo Arcaro of Bank of Europe "to explain the Loan Participation Program." (SAC ¶ 31.)

4

Arcaro told Standard Chartered that individuals "committed funds to Bank of Europe for the purpose of lending the funds to Banco Santos. In exchange, the customers were promised that Bank of Europe would return their money plus interest at a certain rate on a certain maturity date." (SAC ¶ 31.) Plaintiffs allege that Standard Chartered was made aware of a fiduciary relationship between Plaintiffs and Bank of Europe. A Standard Chartered Call Report stated that "Bank of Europe has been funding itself through deposits taken from and papers issued and sold to institutional investors and high net worth individuals." (SAC ¶ 33). In their internal "Customer History and Profile" for Bank of Europe, they described the bank's business as "Purchase/sale of securities, lending, private banking. The bank's main clients are made of corporate customers and high net work [sic] individuals." (SAC ¶ 32; see also, SAC ¶¶ 191,263.)

BOA allegedly knew the purpose of the Loan Participation Program. One month prior to opening Bank of Europe's account at BOA, Julie Schlossman from Bank of Europe, in providing the paperwork necessary to open the account, provided BOA with Bank of Europe's balance sheet, "listing loan participations as Bank of Europe's primary source of capital." (SAC ¶ 36.) A few weeks after the account was opened, the head of BOA's Sao Paulo branch in Brazil met with Schlossman and asked her about the Loan Participation Program. She informed him that "it was a program

5

in which people deposited money to be loaned to Banco Santos, to receive the higher interest rate that Bank of Europe was able to offer because of the spread between Brazilian and American interest rates at that time" and that "the clients' money was to be returned on the maturity date with the accrued interest."

Despite their alleged knowledge of the purpose of the Loan Participation Program, Standard Chartered and BOA made transfers to art galleries, auction houses, members of Ferreira's family, art, book, map and photography dealers, and American Express. (SAC ¶ 10.)

Defendants also made transfers to "Brazilian black market currency traders known as 'doleiros,'" which were likewise outside the scope of the purpose of the Loan Participation Program. (SAC ¶ 43.) These "doleiros" included Lespan, Tanzy and Braza. (SAC ¶ 47.) At the time BOA was making transfers to the Lespan account, "BOA knew . . . Lespan was at the center of Manhattan District Attorney's money-laundering investigation of BOA." (SAC ¶¶ 46, 47.) The investigation found that "'[m]any Brazilian money service businesses conducted illegal transmittal operations through the account of a Uruguayan money remitter at the office of Bank of America Corporation's subsidiary Bank of America, N.A. in Manhattan. From May 2002 to April 2004, more than $3 billion flowed through this account, originating in entities controlled by these black market currency traders, the

6

owners of which are being prosecuted in Brazil for violations of Brazilian law." (SAC ¶ 48.) Tansy, S.A. was also "publicly identified as the facilitator of a major bank fraud in 2002" by serving as "the 'exchange house' with an account at BOA through which Brazilian investors were defrauded of tens of millions of dollars." (SAC ¶ 51; see also, SAC ¶ 44.)

Plaintiffs allege that Standard Chartered "knew that the transactions it was conducting for Bank of Europe posed significant liability risks." (SAC ¶ 210.) For this reason, "on November 22, 2002, Standard Chartered's Joanne McAndrew requested that the Bank of Europe account be assigned a 'HIGH' risk rating." (SAC ¶ 210.) Standard Chartered later admitted in a signed written agreement dated September 2004, that "less than nine months after it ceased its relationship with Bank of Europe . . . it had deficiencies in its handling of correspondent bank accounts for offshore banks during the same time it had a correspondent account with Bank of Europe." (SAC ¶ 60.)

### C. The Instant Litigation

Plaintiffs, investors through Bank of Europe, seek damages from both Standard Chartered and BOA for their actions as Bank of Europe's correspondent banks. In the Second Amended Complaint, Count I alleges that Defendants aided and abetted fraud. (SAC ¶

7

110.)  Count II alleges that Defendants aided and abetted a breach of fiduciary duty. (SAC ¶ 115.)  Count III alleges that Defendants committed acts of commercial bad faith. (SAC ¶ 121.) BOA here moves to dismiss all three counts for failure to state a claim under which relief may be granted.  Standard Chartered here moves to dismiss Counts I and II pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for failure to state a claim under which relief may be granted.  Since Counts II and III were already decided, this memorandum will address only Count I.  <u>Abreu I</u>, 525 F.Supp.2d.

**II. Discussion**

    **A. <u>Rule 12(b)(6) Standard</u>**

    Standard Chartered and BOA move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the aiding and abetting fraud count.  A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In evaluating a complaint, a court must read the complaint generously, accepting the truth of, and drawing all reasonable inferences from, well-pleaded factual allegations.  <u>See</u> <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1174 (2d Cir. 1993).  The complaint must provide "plausible grounds" for the allegations

8

with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.[5] Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 165 (2007). The issue on a motion to dismiss is not whether a plaintiff is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." Weisman v. LeLandais, 532 F.2d 308, 311 (2d Cir. 1976)(per curium).

### B. Rule 9(b) Standard

---

[5] The Supreme Court recently overturned the pleading standard set in Conley v. Gibson, which had provided that a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Bell Atlantic Corp. V. Twombly, 127 S.Ct. 1955, 1968 (2007) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In Twombly, the Supreme Court provides that "Conley's 'no set of facts' language has been questioned, criticized, and explained away long enough," has "earned its retirement," and is now "best forgotten." Twombly, 127 S.Ct. at 1966. The Second Circuit has recognized in Iqbal v. Hasty that Twombly "explicitly disavowed" the "no set of facts" standard that previously had been applied at the pleading stage, and "require[s] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 2007 WL 1717803 at *9, *11 (2d Cir. June 14, 2007). Furthermore, while Twombly was an antitrust case, the Second Circuit and the Southern District of New York have applied Twombly more broadly, as in: (1) Iqbal, 490 F.3d 143, 2007 WL 1717803 (qualified immunity defense), (2) ATSI Communications, Inc. V. Shaar Fund, Ltd., 493 F.3d. 87, 98 n.2 (2d Cir. 2007) (declining, in the context of securities fraud, "to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases"), and (3) American Fin. Int'l Group-Asia, L.L.C. v. Bennett, Slip Copy, No. 05 Civ. 8988 (GEL), 2007 WL 1732427 (S.D.N.Y. June 14, 2007)(applying Twombly's plausibility standard to claims of, inter alia, breach of fiduciary duty and unjust enrichment).

9

Standard Chartered and BOA also move pursuant to Federal Rule of Civil Procedure 9(b) to dismiss the aiding and abetting fraud count. Rule 9(b) provides that the circumstances of fraud must "be alleged with particularity," requiring "reasonable detail as well as allegations of fact from which a strong inference of fraud reasonably may be drawn." National Council of Young Israel v. Wolf, 963 F.Supp. 276, 281 (S.D.N.Y. 1997) ("Young Israel"). The rule also provides that "condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). A more general standard of scienter is applicable because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." Wight v. Bank America Corp., 219 F.3d 79, 91 (2d Cir. 2000)(citing Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987)). However, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Shields v. CityTrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)(internal quotation marks and citations omitted). Therefore, with respect to "condition of mind," it is required that a plaintiff "allege facts that give rise to a strong inference of fraudulent intent." Id., see also Polycast Technology Corp. V. Uniroyal, Inc., 728 F.Supp. 926, 935 (S.D.N.Y. 1989)(citing Connecticut Nat'l, 808 F.2d at 962).

A complaint may give rise to a strong inference of fraudulent intent in two ways.  First, the plaintiff may allege "a motive for committing fraud and a clear opportunity for doing so."  Powers v. British Vita, P.L.C., 57 F.3d 17, 184 (2d Cir. 1995)(quoting Beck v. Manufactruers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987), overruled in part on other grounds, United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir. 1989)(en banc)(citations omitted)).  Second, where there is no apparent motive, it is also possible to plead scienter by "identifying circumstances indicating conscious behavior by the defendant," but "the strength of circumstantial allegations must be correspondingly greater."  Powers, 57 F.3d at 184.

**C. Aiding and Abetting Fraud Claim**

To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) actual knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abetter in the achievement of the underlying fraud.  See Oei v. Citibank, N.A., 957 F.Supp. 492, 520 (S.D.N.Y. 1997)(citing Morin v. Trupin, 711 F.Supp. 97, 112 (S.D.N.Y. 1989)).  Constructive knowledge is insufficient to create aiding and abetting liability; actual knowledge is required.  See Steed Fin. L.D.C.

v. Laser Advisers, Inc., 258 F.Supp.2d 272, 282 (S.D.N.Y. 2003). Substantial Assistance exists where "(1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed,' and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'" Rosner v. Bank of China, 528 F.Supp.2d 419, 426 (S.D.N.Y. 2007)(citations omitted); see also, Pension Comm. Of Univ. Of Montreal Pension Plan v. Banc of America Sec., L.L.C., 446 F.Supp.2d 163, 202 (S.D.N.Y. 2006); Nigerian Nat'l Petrleum Corp. v. Citibank, N.A., No. 98 Civ. 4960 (MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999). A party alleging aider and abettor liability with respect to fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). See Morin, 711 F.Supp. at 112-13.

In their First Amended Complaint, the Plaintiffs adequately alleged the existence of an underlying fraud and actual knowledge of the fraud by both Standard Chartered and BOA. Abreu I, 525 F.Supp.2d at 388-390. These elements were therefore previously satisfied with respect to both Defendants and will not be discussed here. Plaintiffs, however, previously failed to allege substantial assistance adequately and were granted leave to amend this element of the aiding and abetting fraud claim, specifically with respect to the transfers of funds from the Bank of Europe accounts at both Standard Chartered and BOA to black market

12

currency traders. Abreu I, 525 F.Supp.2d at 398.

a. Standard Chartered

The substantial assistance element is met with respect to Standard Chartered. Plaintiffs allege that Standard Chartered transferred funds at Bank of Europe's request to "improper" destinations. (SAC ¶ 10.) These destinations included art galleries, auction houses, members of Ferreira's family, art, book, map and photography dealers, and American Express. (SAC ¶ 10.) Plaintiffs further allege that Standard Chartered transferred funds at Bank of Europe's request to "black market currency traders" like Lespan, Tansy and Braza. (SAC ¶¶ 43-47, 51.) Plaintiffs allege with particularity that Standard Chartered knew about the Loan Participation Program, knew that Bank of Europe had established a fiduciary relationship with the Plaintiffs, and knew that the transactions they performed for Bank of Europe were outside the scope of both the Loan Participation Program and the fiduciary relationship. Standard Chartered argues that Plaintiffs failed to allege that these transactions were not routine or typical. Standard Chartered's Memorandum ("Standard Chartered's Mem.") 5-6 (citing Rosner, 528 F.Supp.2d at 427 ("Financial transactions that are not considered

'atypical' or 'non-routine' do not constitute substantial assistance") (citations omitted)). However, multiple transfers to Ferreira's personal creditors and family members as well as known black market currency traders cannot be presumed routine or typical banking transactions, especially when viewing the claim in the light most favorable to the Plaintiff. This argument therefore fails to negate Plaintiffs' claim.

In their Second Amended Complaint, Plaintiffs allege with particularity that Standard Chartered knew that the purpose of the Bank of Europe's Loan Participation Program was one "in which individual customers . . . committed funds to Bank of Europe *for the purpose of lending the funds to Banco Santos*" and that, in return, they "were promised that Bank of Europe would return their money plus interest." (SAC ¶ 31)(emphasis added.) Despite this knowledge, Standard Chartered proceeded to transfer funds at Bank of Europe's direction to entities other than Banco Santos, constituting affirmative assistance of the fraud. Substantial assistance requires that, absent a duty to act, a defendant "affirmatively assists" or "helps to conceal" the fraud. Pension Comm., 446 F.Supp.2d at 202(citing Nigerian Nat'l Petrleum Corp., No. 98 Civ. 4960 (MBM), 1999 WL 558141).

Furthermore, Standard Chartered knew of the fiduciary relationship that existed between Bank of Europe and the Plaintiffs. (SAC ¶ 29-38, 191, 263a-e); see also, Abreu I, 525

14

F.Supp.2d at 394(finding that a fiduciary duty existed between Plaintiffs and Bank of Europe). Standard Chartered, despite this knowledge, continued to make transfers outside the scope of the Plaintiffs' relationship with Bank of Europe, further satisfying the substantial assistance element for Standard Chartered.

In transferring funds out of the Bank of Europe account to improper destinations instead of investing it, Standard Chartered proximately caused Plaintiffs' to lose their money. Proximate cause exists when "defendant's actions are a substantial factor in the sequence of responsible causation, and plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence." Pension Comm., 446 F.Supp.2d at 201 n. 282 (citing McDaniel v. Bear, Stearns & Co., 196 F.Supp.2d 343, 359). Standard Chartered argues that Plaintiffs failed to show how Standard Chartered's assistance amounted to substantial assistance. Standard Chartered's Mem. 7. As a shell bank, Bank of Europe relied on Standard Chartered to carry out its fraudulent scheme. The assistance Standard Chartered provided was crucial to carrying out the money laundering scheme. Standard Chartered's assistance was therefore a "substantial factor." Given Standard Chartered's knowledge that the transactions were outside the scope of the Loan Participation Program as well as the relationship between Plaintiffs and Bank of Europe, it was also reasonably foreseeable that their actions

15

would result in the Plaintiffs' losing money.

b. BOA

Likewise, Plaintiffs' Second Amended Complaint alleges with particularity that BOA knew of the purpose of the Loan Participation Program and yet made numerous transfers outside the scope of the Loan Participation Program. (SAC ¶ 31.) These transfers were not routine or "usual banking services," as BOA argues; they were designed to support Ferreira's lifestyle rather than manage Plaintiffs' assets. BOA's Memorandum ("BOA's Mem.") 9. BOA affirmatively assisted Ferreira in his fraudulent scheme, thereby satisfying the substantial assistance element.

Additionally, BOA's involvement in two investigations concerning their New York Branch's account with Lespan and Tansy put them on notice that Lespan and Tansy were black market currency traders. BOA argues that, even if BOA knew that Lespan and Tansy were black market currency traders, Plaintiffs failed to allege that these transfers amounted to substantial assistance. However, substantial assistance requires that the defendant "affirmatively assists" the fraud, and knowingly making transfers to black market currency traders is an act of affirmative assistance. Furthermore, BOA's continued transfers from the Bank of Europe account to Lespan and Tansy in the face

16

of ongoing investigations of their involvement in money laundering schemes cannot be considered, as BOA argues, routine banking transactions. (SAC ¶¶ 44, 46, 47, 51, 265a.)

Like Standard Chartered, BOA proximately caused Plaintiffs' injuries because BOA transferred funds out of the Bank of Europe account to improper destinations, with knowledge the funds were not being properly invested.[6] BOA argues that the fraud was "complete when plaintiffs relinquished control of their funds to [Bank of Europe]." BOA's Mem. 10. This argument fails, however, because of the nature of the shell bank and correspondent bank relationship. As Bank of Europe was a shell bank unable to perform these transactions on its own, without BOA's assistance the funds could not have been transferred; only once the funds were transferred out of the Bank of Europe account were they of any use to Ferreira. BOA's actions, therefore, were a substantial factor in causing the Plaintiffs injury, and the injury was reasonably foreseeable. BOA proximately caused the Plaintiffs to lose their money. The substantial assistance

---

[6]BOA argues that, "[P]laintiffs have failed to allege that BOA had any way of distinguishing between a transfer out of the BOE account which involved funds that should have been committed to the LPP and a transfer out of the BOE account which involved matured LLP funds or funds placed into that account for *some other purpose than LLP (such as personal and money market account funds.*" BOA's Mem. 17 (emphasis added). However, this argument is then called into question by the acknowledgment that "[Bank of Europe] certainly did not have discretionary authority over plaintiff's personal and money market accounts." BOA's Mem. 22.

17

element with respect to BOA is therefore met.

Plaintiffs have adequately alleged all three elements of aiding and abetting fraud with particularity.

### III. Conclusion

For the aforementioned reasons, Defendants' motions to dismiss are DENIED.

SO ORDERED

Dated: August 6, 2008